IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    )
                         )
         vs.         ) Criminal No. 03-94
                         )
SAMUEL T. DURST         )
JOHN D. MARMO           )

<u>MEMORANDUM</u>

I

Pursuant to Fed.R.Crim.P. 29(a), defendants, Samuel T. Durst and John D. Marmo, have moved for judgments of acquittal with respect to Count One of Indictment No. 03-94. For the reasons set forth below, the motions will be granted.

II

With respect to the background of this criminal action, in Count One of the indictment, defendants were charged as follows:

**<u>INDICTMENT</u>**

The grand jury charges:

1. At all times relevant to this indictment, defendant JOHN D. MARMO, along with his wife Cindy Marmo, were the owners of the bar known as "Johnny Doggs", located at 805 Croton Avenue in New Castle, Pennsylvania (hereinafter "Johnny Doggs").

2. From in or around March 2002, and continuing thereafter through on or about May 8, 2002, in the Western District of Pennsylvania, defendants SAMUEL T. DURST and JOHN D. MARMO did conspire and agree to violate Title 18, United States Code, Section 844(i), to wit: defendants SAMUEL T. DURST and JOHN D. MARMO conspired and agreed to cause a fire at the building which housed the bar known as "Johnny Doggs" located at 805 Croton Avenue, New Castle, Pennsylvania, which

building was used in interstate commerce and in
activity affecting interstate commerce.

### **Manner and Means of the Conspiracy**

3.  It was part of the conspiracy that defendants
SAMUEL T. DURST and JOHN D. MARMO would cause a fire at
Johnny Doggs in order to destroy Johnny Doggs.

### **Overt Acts**

4.  Defendants SAMUEL T. DURST and JOHN D. MARMO
did commit the following overt acts in furtherance of
the conspiracy:

a.  In or around March of 2002, defendant JOHN D.
MARMO did solicit an individual known to the grand jury
to set fire to Johnny Doggs.

b.  In or around April of 2002, defendant JOHN D.
MARMO did solicit an individual known to the grand jury
to set fire to Johnny Doggs.

c.  On or about May 8, 2002, defendant SAMUEL T.
DURST did intentionally and maliciously set fire to
Johnny Doggs.

In violation of Title 18, United States Code,
Section 371.

In Count Two, Mr. Durst was charged with causing the fire which

destroyed the bar known as "Johnny Doggs" in New Castle,

Pennsylvania on May 8, 2002, in violation of Title 18, United

States Code, Section 844(i).

The trial of this case commenced on February 15, 2005.

When the government rested its case on February 18, 2005,

defendants moved for judgments of acquittal under Rule 29(a) of

the Federal Rules of Criminal Procedure.  After hearing the

arguments of counsel, the Court reserved a decision on the

2

motions pending the close of all the evidence under Fed.R.Crim.P. 29(b).  On February 23, 2005, following the close of all the evidence, defendants renewed their Rule 29 motions.  Again, the Court reserved a decision on the motions under Fed.R.Crim.P. 29(b).

On February 24, 2005, the jury returned its verdicts. With respect to the arson charge in Count Two, the jury found Mr. Durst not guilty.  However, with respect to the conspiracy charge in Count One, the jury found both defendants guilty.  Following their convictions on Count One, the Court did not order defendants detained.  Rather, defendants' bonds were continued pending the disposition of their motions for judgments of acquittal.

III

In reviewing a motion for judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure, "a district court must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'"  United States v. Smith, 294 F.3d 473, 476-77 (3d Cir.2002), *citing*, United States v. Wolfe, 245 F.3d 257, 262 (3d Cir.2001).  *See also* United States v. Giampa, 758 F.2d 928 (3d Cir.1985)(A judgment of acquittal should be entered only upon consideration of the sufficiency of

3

the government's evidence, that is, the district court must determine whether the government has presented sufficient evidence respecting each element of the offense charged to permit jury consideration).  Applying the foregoing standard in the present case, the Court concludes that defendants' Rule 29 motions must be granted.[1]

IV

In summary, the evidence viewed in the light most favorable to the government established the following facts

---

[1]As noted, defendants moved for judgments of acquittal under Fed.R.Crim.P. 29(a) after the close of the government's evidence, and the Court reserved decision under Fed.R.Crim.P. 29(b), which provides:

**Rule 29. Motion for a Judgment of Acquittal**

\*   \*   \*

**(b) Reserving Decision.**  The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

\*   \*   \*

Thus, in ruling on defendants' motions for judgments of acquittal, the Court's review will be limited to the evidence presented by the government before the close of its case against defendants.

concerning the conspiracy charge in Count One of Indictment No. 03-94:[2]

In 1995, Mr. Marmo and his wife, Cindy, purchased Johnny Doggs, which was located in New Castle, Pennsylvania. (Trial Tr., 2/15/05, p. 136, Trial Tr., 2/16/05, p. 16).  Mr. Durst, who is Mr. Marmo's stepson, was employed as an hourly wage earner at Johnny Doggs.  (Trial Tr., 2/15/05, pp. 172-73).  In 2001, the Marmos purchased another bar in New Castle known as "The Bomb Shelter".  (Trial Tr., 2/16/05, pp. 7-8).

---

[2]During the trial, the government called Lisa Joseph to testify concerning a statement allegedly made by Mr. Durst while he was working at Johnny Doggs.  Specifically, Ms. Joseph testified that Mr. Durst stated in the spring of 2001 that he hoped to become the manager of Johnny Doggs since his stepfather had opened The Bomb Shelter, but that, if things did not work out, he had a plan to destroy Johnny Doggs by setting a fire in the basement.  (Trial Tr., 2/16/05, pp. 143-45).  The government also called Jarvis Nixon to testify regarding incriminating statements allegedly made by Mr. Durst.  In this regard, Mr. Nixon testified that approximately a week before the fire, Mr. Durst stated that "we could get a lot of money" if we set Johnny Doggs on fire.  Mr. Nixon further testified that, after the fire, Mr. Durst told him that he and his friends had set the fire in the basement of the bar.  (Trial Tr., 2/17/05, pp. 92-96).

In summarizing the evidence in the light most favorable to the government as to Count One, the Court will exclude the testimony of Ms. Joseph and Mr. Nixon because defense counsel requested, and the Court granted without objection by the government, limiting instructions to the jury concerning their consideration of this evidence.  Specifically, the jury was instructed that their consideration of the testimony of Ms. Joseph and Mr. Nixon was limited to the arson charge against Mr. Durst in Count Two of the indictment.  (Trial Tr., 2/16/05, pp. 140-41, Trial Tr., 2/17/05, p. 130).  Therefore, their testimony will not be considered in the Court's review of defendants' Rule 29 motions as to Count One.

In March, 2001, Mr. Marmo listed Johnny Doggs for sale with a real estate agent.  Although several individuals expressed an interest in buying the bar, no sale was consummated before the listing contract expired in March, 2002, and Mr. Marmo did not re-list Johnny Doggs for sale.  (Trial Tr., 2/15/05, pp. 41-45). While Johnny Doggs was listed for sale, Brian Kudlac worked as a disc jockey at the bar.  When one of his friends inquired about purchasing Johnny Doggs, Mr. Kudlac informed Mr. Durst who, in response, stated: "[I]t would be a lot easier if it would just burn down."  (Trial Tr., 2/18/05, pp. 9-10).

In the months preceding the fire at Johnny Doggs, numerous checks which had been written on the bar's checking account bounced, and, in February, 2002, Mrs. Marmo withdrew the remaining balance of $182.25 from the checking account.  In April, 2002, Johnny Doggs' checking account was closed by the bank with a negative balance of $313.00.  Thereafter, Johnny Doggs operated without a checking account.  (Trial Tr., 2/16/05, pp. 9-10).

Prior to May 8, 2002, when Johnny Doggs was destroyed by fire, the bar had become infested with rats.  (Trial Tr., 2/15/05, pp. 125, 147-48, Trial Tr., 2/17/05, p. 18).  In addition, the clientele of Johnny Doggs had been "getting a little rough."  Mr. Marmo had been "sucker punched" by a patron, and one of the bouncers at Johnny Doggs had begun to wear a

Kevlar vest to work.  (Trial Tr., 2/17/05, pp. 4-5).  Moreover, Mr. Marmo was unhappy with the fact that the clientele of Johnny Doggs had begun to include more and more black patrons.  (Trial Tr., 2/18/05, p. 23).

Between April, 2001 and August, 2002, Tanya Kudlac worked as a bartender at The Bomb Shelter.  On several occasions, Ms. Kudlac overheard Mr. Marmo state that he wished Johnny Doggs would burn down, indicating that he could "pay his wife off" with the insurance proceeds.  According to Ms. Kudlac, a cigarette machine had been moved from Johnny Doggs to The Bomb Shelter several days before the fire on May 8, 2002.  (Trial Tr., 2/18/05, pp. 21-22, 24-27).

From October, 2001 to May, 2002, Penny Knight worked at The Bomb Shelter as a bartender and cook, and, on several occasions, Ms. Knight overheard Mr. Marmo state that he wanted Johnny Doggs to be destroyed by fire.  The last occasion occurred "about a month before" the fire.  (Trial Tr., 2/15/05, pp. 90, 106-07).

David Doerr was employed as a bouncer at both Johnny Doggs and The Bomb Shelter.  In March, 2002, shortly after "a pretty big fight" at Johnny Doggs, Mr. Marmo asked Mr. Doerr "in passing" if he would burn the bar, suggesting that Mr. Doerr would "just have to kick the wall in where everybody else breaks in and go in the basement."  Mr. Doerr refused Mr. Marmo's

request.  In April, 2002, Mr. Marmo renewed his request for Mr.
Doerr to burn Johnny Doggs "in passing", and, again, Mr. Doerr
declined.  (Trial Tr., 2/17/05, pp. 3-7).

The front door to Johnny Doggs was secured by two
deadbolts, and a key was needed to open and to lock the door from
the outside and from the inside.  There were three keys to Johnny
Doggs' front door.  Each of the Marmos had a key and Christine
Aven, who was employed as a day shift bartender at Johnny Doggs,
had the third key.  On May 8, 2002, the day of the fire, Ms. Aven
opened the bar at 11:00 a.m.  Immediately upon entering through
the front door with her key, Ms. Aven went to the back of the bar
to disarm the alarm system by punching in her code.  Shortly
thereafter, Mr. Durst came into Johnny Doggs.  He picked up a few
CDs, called his girlfriend from the back of the bar and left.
(Trial Tr., 2/15/05, pp. 136-38, 142-43, 146).

Ronda Trott was scheduled to work the night shift at
Johnny Doggs on May 8, 2002.  However, late in the afternoon, she
called Ms. Aven to inform her that she was not coming in because
she was sick.  When Ms. Trott was unable to get in touch with
either of the Marmos to call off sick, Ms. Aven agreed to stay
until 8:30 or 9:00 p.m. and close the bar.  Prior to leaving
Johnny Doggs at approximately 8:40 p.m., Ms. Aven put the money
from the cash register in a bag and placed it in the desk drawer
in the bar's basement.  She then emptied the ashtrays, set the

8

alarm and left, locking the front door with her key.  (Trial Tr., 2/15/05, pp. 148-49, 151-53, Trial Tr., 2/16/05, p. 54).  Shortly thereafter, a customer named John Prioletti arrived at Johnny Doggs.  The lights were on and the front door was open about 7 inches, although the top deadbolt was in the locked position. Mr. Prioletti entered Johnny Doggs and called out for the bartender.  When he received no response, Mr. Prioletti called The Bomb Shelter to inform the Marmos of the situation.  Several minutes later, Mrs. Marmo and Daniel Smith, who was employed as a bouncer at The Bomb Shelter, arrived at Johnny Doggs.  (Trial Tr., 2/15/05, pp. 181-85, Trial Tr., 2/16/05, p. 158).

After Mrs. Marmo and Mr. Smith arrived at Johnny Doggs, Mr. Smith sat with Mr. Prioletti at the bar while Mrs. Marmo went to the basement to get the money bag.  Despite the fact that the bar had been discovered unlocked and apparently unattended, Mrs. Marmo did not ask Mr. Smith to accompany her to the basement.  At 9:18 p.m., Mrs. Marmo called Ms. Aven to ask her whether she had locked the front door of Johnny Doggs upon leaving.  After 5 to 10 minutes, Mrs. Marmo came back upstairs, thanked Mr. Prioletti for watching the bar and gave him a 12-pack of beer before he left.  When Mrs. Marmo was unable to set the bar's alarm system, Mr. Smith discovered that the sensor for the bar's front door was hanging from the door jamb.  Mr. Smith taped the sensor in place, and Mrs. Marmo set the alarm system.  After exiting the bar

through the front door, Mr. Smith locked the door behind them with Mrs. Marmo's key, and they returned to The Bomb Shelter. Mrs. Marmo and Mr. Smith had been at Johnny Doggs for approximately 20 minutes. (Trial Tr., 2/15/05, p. 154, Trial Tr., 2/16/05, pp. 5, 158-61, 163-64).

At 9:43 p.m., after Mrs. Marmo and Mr. Smith had left Johnny Doggs, the New Castle Fire Department received a report of a fire at Johnny Doggs. When the assistant fire chief arrived on the scene, smoke was pouring out of Johnny Doggs. Because the bar was locked and secured, he broke the picture window that was located next to the front door to gain entry to the building. (Trial Tr., 2/15/05, pp. 56-58, 61).

At 9:44 p.m., Ms. Aven received a telephone call from the Lawrence County Emergency Department to report the fire at Johnny Doggs. Ms. Aven immediately drove to the bar where she observed smoke pouring out of the building. Ms. Aven then called the Marmos at The Bomb Shelter to report the fire at Johnny Doggs. (Trial Tr., 2/15/05, pp. 155-57, Trial Tr., 2/16/05, p. 5). Following the fire, the Marmos submitted a claim to their insurer, Mid-Continent Insurance Company, under a policy of insurance that was scheduled to expire on May 20, 2002. In November, 2002, Mid-Continent Insurance Company made payments

10

totaling $108,647.19 with respect to the claim submitted by the Marmos.  Of this amount, the Marmos received $26,600.00.[3]

        When interviewed by a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Mr. Durst stated that he was at The Ranch Bar in Ellwood City on the night of the fire at Johnny Doggs, and his alibi was "confirmed through several witnesses." (Trial Tr., 2/17/05, p. 36).  There is no physical evidence linking Mr. Durst to the fire at Johnny Doggs on May 8, 2002.  Moreover, no one provided any evidence regarding conversations between Mr. Durst and Mr. Marmo concerning a conspiracy to destroy Johnny Doggs by fire.  Finally, there is no evidence that Mr. Durst profited from the fire at Johnny Doggs. (Trial Tr., 2/17/05, pp. 42-43).

        The fire at Johnny Doggs was determined to be an act of arson.  The fire originated in the northwest corner of the rear basement storage room on the lower shelf of a wooden two-shelf storage unit that contained paper products, and the fire was started by someone applying an open flame to the combustible paper products that were stored on the lower shelf.  Two

---

[3]The $108,647.19 was distributed by Mid-Continent Insurance Company as follows: (a) $1,360.00 to Siegel Excavating for demolition services; (b) $61,975.18 to Janice and Richard Smith to pay off the Marmos' mortgage on Johnny Doggs; (c) $5,984.82 to the City of New Castle for delinquent taxes on the property; (d) $11,040.00 to the Marmos and the City of New Castle to be held in escrow for future demolition costs; (e) $26,600.00 to the Marmos; and (f) $1,687.19 to Mizerak Adjusting Company for services rendered.  (Trial Tr., 2/17/05, pp. 60-65, Govt. Exh. 38).

11

discarded cans of charcoal lighter fluid were found on the floor of the small room adjacent to the first floor kitchen which contained the bar's beer cooler.[4]  (Trial Tr., 2/16/05, pp. 55-56, 67-70, 76, 82).

Approximately two weeks before the fire at Johnny Doggs, Brian Kudlac began to work as a disc jockey at the bar, and he stored his CDs in the disc jockey booth when he was not working.  On the Saturday before the fire, which was the last occasion on which Mr. Kudlac worked as a disc jockey at Johnny Doggs, Mrs. Marmo suggested that he take his "CDs home in case something happened to them."  (Trial Tr., 2/18/05, pp. 6-8).  After the fire, Mr. Kudlac spoke with Mr. Marmo who stated that he was angry with his wife "because she kept changing her story."  (Trial Tr., 2/18/05, pp. 10-11).

V

In order to sustain a defendant's conviction for conspiracy, the government must have put forth evidence tending to prove that the defendant entered into an agreement and knew

---

[4]According to the government, because the fire was set in the basement of Johnny Doggs, the arsonist had to have a key to either get in and out of the bar if he or she was not in the bar when Mr. Smith locked the front door or to just get out and lock the door behind him or her if the arsonist was hiding somewhere in the bar when Mr. Smith locked up.  In this regard, the government's evidence established that there were only three keys to Johnny Doggs, and that the only key which was not accounted for at the time of the fire was Mr. Marmo's key.  (Govt's Response, p. 7).

that the agreement had the specific unlawful purpose charged in
the indictment.  United States v. Cartwright, 359 F.3d 281, 286-
87 (3d Cir.2004).[5]  Mere presence at the scene of a criminal act
or association with conspirators does not constitute intentional
participation in a conspiracy, even if the defendant has
knowledge of the conspiracy.  Evidence tending to show knowing
participation in the conspiracy is also needed, *i.e.*, facts
sufficient to draw a logical and convincing connection between
circumstantial evidence of an agreement, and the inference that
an agreement was in fact made.  United States v. Jones, 393 F.3d
107, 111 (2d Cir.2004).  *See also* United States v. Provenzano,

---

[5]With respect to the elements of conspiracy, the jury in the
present case was instructed as follows:

"In order to establish the crime of conspiracy charged
in the indictment, the government must prove, beyond a
reasonable doubt, each of the following elements:

First, that two or more persons entered into the
unlawful agreement charged in the indictment beginning in or
around March of 2002.

Second, the defendants knowingly and willfully became
members of the charged conspiracy.

Third, that one of the members of the conspiracy
knowingly committed at least one of the overt acts charged
in the indictment.

And fourth, that the overt act or acts which you find
to have been committed were committed to further some
objective of the conspiracy."

(Trial Tr., 2/23/05, p. 32).

13

620 F.2d 985, 999 (3d Cir.1980)(What must be shown is the
defendant's participation in the conspiracy, *i.e.*, agreement, as
opposed to mere knowledge thereof or approval, but from a showing
of knowledge plus actions taken in furtherance of the conspiracy,
the jury may infer the necessary agreement).  Defendants assert
that the government failed to present evidence of an agreement
between Mr. Marmo and Mr. Durst to destroy Johnny Doggs by fire,
and that, therefore, they are entitled to judgments of acquittal
on the conspiracy charge in Count One of the indictment.  After
consideration, the Court agrees.

         The indictment in this case charged defendants with
three overt acts in furtherance of the conspiracy.  The first two
overt acts were Mr. Marmo's solicitations of Mr. Doerr in March
and April of 2002 to set a fire at Johnny Doggs, and the third
overt act was Mr. Durst's alleged act of setting the fire at
Johnny Doggs on May 8, 2002.  The Court agrees with Mr. Durst
that (a) based on his acquittal on Count Two (the third overt
act), the jury necessarily decided Count One based on Mr. Marmo's
solicitation of Mr. Doerr to set a fire at Johnny Doggs, and (b)
proof of "Mr. Marmo's solicitation of Dave Doerr does not in any
way evidence an agreement between Mr. Marmo and Mr. Durst, but at
best tends to support an alleged conspiracy between Mr. Marmo and
some person other than Mr. Durst."  (Durst Motion, p. 23).
Simply put, the government presented no evidence of an agreement

between Mr. Marmo and Mr. Durst to set fire to Johnny Doggs.
Rather, the Court agrees with Mr. Durst that the only evidence
linking him to Mr. Marmo is (a) the fact that he was Mr. Marmo's
stepson, (b) he worked at Johnny Doggs and (c) and he stated to
Mr. Kudlac that it would be easier for Johnny Doggs to burn down
than to sell it.  (Durst Motion, p. 24).  Clearly, this evidence
is insufficient to prove beyond a reasonable doubt the conspiracy
between Mr. Marmo and Mr. Durst that is charged in Count One of
the indictment.  Under the circumstances, defendants' motions for
judgments of acquittal will be granted.

An order follows.